1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   RALPH INTERNATIONAL THOMAS,            No. C 93-0616 MHP

10          Petitioner,                    **ORDER GRANTING IN PART AND
                                           DENYING IN PART AMENDED**
11    v.                                   **PETITION FOR WRIT OF HABEAS
                                           CORPUS**
12   ROBERT K. WONG, Acting Warden of
     California State Prison at San Quentin
13
            Respondent.
14   _____/

15          Petitioner filed an amended petition for writ of habeas corpus addressing guilt phase claims

16   on January 30, 2008.  Respondent filed an answer on July 2, 2008.  Petitioner filed a traverse on

17   January 8, 2009.  Having reviewed the papers and the record presented to date, the Court finds and

18   orders as follows.

19                            **FACTUAL BACKGROUND**

20          The following recitation of the factual background of this case is based primarily on the

21   Supreme Court of California's opinion disposing of petitioner's direct appeal, People v. Thomas, 2

22   Cal. 4th 489 (1992), and its opinion following an evidentiary hearing, People v. Thomas, 37 Cal. 4th

23   1249 (2006).  The state court's factual determinations are presumed to be correct pursuant to 28

24   U.S.C. § 2254(d).[1]

25          Petitioner was convicted in Alameda County Superior Court in June 1986 of the murders of

26   Greg Kniffin and Mary Gioia in the Rainbow Village area of Berkeley in the early morning hours of

27   August 16, 1985.  Petitioner was a resident of Rainbow Village, a landfill area near the Berkeley

28

_____

[1]  Unless otherwise noted, all references to 28 U.S.C. § 2254(d) are to the pre-Antiterrorism and Effective
Death Penalty Act ("AEDPA") version of that statute.

United States District Court
For the Northern District of California

Marina that provided living space for people who had previously been living in their cars on public streets.  On August 15 and 16, 1985, followers of the Grateful Dead were staying at Rainbow Village because the band was supposed to play locally the following weekend.  Gioia and Kniffin were among them.

During the early morning hours of August 16, 1985, Gioia and Kniffin were beaten and shot near the Rainbow Village.  Gioia's body was seen floating in the San Francisco Bay on the morning of August 16.  Berkeley Police Detective Eric Eihl testified that petitioner was about 45 feet from her body and her face was not yet visible when he stated, "That's Mary."  Kniffin's body was recovered by an underwater team the next day.

Petitioner was arrested shortly after the murders.  The prosecution's case consisted entirely of circumstantial evidence falling into four categories: 1) petitioner's ownership of a rifle that could have inflicted the fatal wounds, and which he was seen using on August 15 but reported stolen shortly thereafter, 2) sightings of petitioner alone with the victims shortly before the killings, 3) petitioner's conduct and statements after the killings suggesting guilt, and 4) certain physical evidence, including a corncob pipe found at the murder scene, that was argued to have belonged to petitioner.

Petitioner was represented at trial by James Chaffee of the Alameda County Public Defender's Office.  His defense was based largely on the testimony of Vivian Cercy.  Cercy was the girlfriend of Harry Shorman, a Rainbow Village resident and its "unofficial mayor."  Cercy testified for the defense at a preliminary hearing.  Because she was unavailable at trial, her preliminary hearing testimony was read to the jury.  Her testimony suggested that another person, a blond man later identified as "Bo", was responsible for the murders.

Cercy and her two young daughters had no permanent address.  She drove a 1973 Dodge, and on the night of August 15, she was parked outside the gates of Rainbow Village.  At about 1:30 a.m. on August 16, Cercy moved her car close to a dumpster located across from a parking lot by the Rainbow Village gates in order to remove trash from the car.  As she walked toward the dumpster, she saw a woman and two men standing near a van.  The woman, who seemed upset, resembled Gioia.  One of the men, who had dark hair and a beard, resembled Kniffin.  The other man, whom

United States District Court
For the Northern District of California

Cercy did not know, was blond and almost six feet tall.  The blond man held an object that looked like a long stick and asked, "Do you think she's seen anything?"  The dark-haired man responded, "No, she couldn't have."  They placed the object against the side of the car.  Cercy testified that the object could have been a rifle.  The woman said to the blond man, "You have to give it back."  He replied, "This could mean money to us, we need this."  The woman said, "I don't want any part of this thing.  I'm going."

The woman began walking and passed Cercy's car.  Cercy invited the woman to spend the night in her car.  The woman declined, saying "I'll be all right."  The woman continued walking.  The blond man told the dark-haired man, "I'll take care of this."  He walked down the roadway.  Cercy drove back to her parking spot and prepared her children to go to sleep.  About fifteen minutes later, she heard three noises that sounded like firecrackers.

Somewhat later, Cercy saw a man resembling the blond man coming up the road.  An hour and a half later, Cercy saw the man resembling the blond man walk up the waterfront, wiping his hands on the vegetation growing there.

Cercy drove up the hill.  Just outside the gates of Rainbow Village, she saw the blond man again.  He was washing his hands and hair in a sink.  She saw him throw something over the fence and heard it make a noise like a tin can when it struck the ground.  Cercy turned and drove down the hill.

About 4 a.m., a man knocked on the window of Cercy's car.  She could not describe him except to say that he was wearing a pea coat.  He asked her a series of questions and told her he was going to kill her.  Cercy remained there until about 5 or 5:30 a.m., when she gave a village resident a ride to work.

The proposition that a third party committed the murders, as suggested by Cercy's testimony, was a principle element of petitioner's defense.  Defense counsel Chaffee however, did not present any witnesses or evidence corroborating Cercy's testimony.

After deliberating for five days, the jury convicted petitioner of first degree murder for killing Kniffin and second degree murder for killing Gioia.  It also found the special circumstance of multiple homicides to be true and fixed the penalty at death.

**PROCEDURAL HISTORY**

The Supreme Court of California affirmed petitioner's convictions, special circumstance finding and death sentence on April 23, 1992.  People v. Thomas, 2 Cal. 4th 489 (1992).  Petitioner subsequently filed two state habeas petitions, which were denied on September 4, 1991, and October 23, 1991.

Petitioner filed a federal habeas petition on April 15, 1996.  The petition contained exhausted and unexhausted claims.  This Court granted petitioner leave to amend the petition to include only exhausted claims and stayed the federal petition pending petitioner's exhaustion of claims in state court.

Petitioner filed a state exhaustion petition on August 1, 1997.  The Supreme Court of California issued an order to show cause on January 24, 2001, directing respondent to:

> . . . show cause . . . why the relief prayed for should not be granted on the ground that trial counsel's failure to investigate and present evidence that another person had killed the two victims and otherwise to investigate and present evidence that would have corroborated Vivian Cercy's testimony deprived petitioner of his right to the effective assistance of counsel.

Doc. 9(g).[2]

After the parties briefed the matter, the Supreme Court of California ordered an evidentiary hearing to be held in the Alameda County Superior Court.  Following the hearing, which took place in August and September 2002, the referee, the Honorable Phillip Sarkissian, concluded that trial counsel had conducted an adequate investigation, and that even if other witnesses had been located, their testimony would not have made a difference in the outcome of the case.  Docs. 9 (r), (s).

The Supreme Court of California subsequently issued an opinion rejecting the referee's conclusion that trial counsel's performance was adequate, finding instead that "because counsel failed to investigate the available avenues most likely to yield corroboration of Cercy and failed to provide any viable tactical justification for that omission, his performance was deficient."  *In re Thomas*, 37 Cal. 4th at 1253.  The majority nonetheless concluded that counsel's deficient

---

[2]  Citations to "Doc." are to the state records lodged in this case by respondent on May 1, 1992, and November 6, 2007.  These documents are listed in the First Supplemental Index of Records filed on November 6, 2007.

**United States District Court**
For the Northern District of California

1   performance was not prejudicial because an adequate investigation would have yielded only three

2   additional witnesses, whose testimony would not have swayed the jury given the strength of the

3   prosecution's case.  *Id*. at 1269-77.  In a strongly worded dissent, Justice Kennard opined that there

4   was a reasonable probability of a different outcome at trial had counsel conducted a reasonable

5   investigation.  *Id*. at 1277-78.

6        In a separate order dated April 12, 2006, the Supreme Court of California summarily denied

7   the remaining claims presented in petitioner's exhaustion petition.  Following the conclusion of state

8   exhaustion proceedings, petitioner filed the instant amended petition on January 30, 2008.[3]

9                                   **STANDARD OF REVIEW**

10        The habeas statute authorizes this court to review a state court criminal conviction "on the

11   ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the

12   United States."  28 U.S.C. § 2254(a).  The purpose of the writ of habeas corpus is to "protect[]

13   individuals from unconstitutional convictions and . . . to guarantee the integrity of the criminal

14   process by assuring that trials are fundamentally fair."  *O'Neal v. McAninch*, 513 U.S. 432, 441

15   (1995); *see also Brecht v. Abrahmson*, 507 U.S. 619, 632-33 (1993).  Because federal habeas review

16   delays finality and burdens state-federal relations, habeas doctrines must balance the protection from

17   unlawful custody the writ offers against "the presumption of finality and legality" that attaches to a

18   state-court conviction after direct review.  *See Brecht*, 507 U.S. at 635-38; *McCleskey v. Zant*, 499

19   U.S. 467, 490-91 (1991).

20        Because petitioner's original habeas petition was filed on April 15, 1996, prior to the

21   enactment of the AEDPA, the provisions of the AEDPA do not apply to his case.  *Lindh v. Murphy*,

22   521 U.S. 320, 336 (1997).  Under pre-AEDPA standards, a federal habeas court must in most cases

23   presume that state court findings of fact are correct unless they are not fairly supported by the

24   record.  28 U.S.C. § 2254(d)(8).  In contrast, purely legal questions and mixed questions of law and

25   fact are reviewed *de novo*.  *See Swan v. Peterson*, 6 F.3d 1373, 1379 (9th Cir. 1993), *cert. denied*,

26   513 U.S. 985 (1994).

27   _____

28        [3]  Respondent asserts that the amended petition is defective pursuant to Rule 2(c) of the Rules Governing
Section 2254 Cases because its verification was signed by counsel as opposed to petitioner.  The issue is moot
because petitioner has filed a declaration authorizing counsel to verify the petition on his behalf.

United States District Court
For the Northern District of California

1    Even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if

2    the constitutional error at issue had a substantial and injurious effect or influence in determining the

3    jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Under this standard, petitioners

4    "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief

5    based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S.

6    at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)). The *Brecht* standard does not

7    however, apply to ineffective assistance of counsel claims. *Kyles v. Whitley*, 514 U.S. 419, 436 n.9

8    (1995) (unnecessary to add a separate layer of harmless error analysis to an evaluation of whether a

9    petitioner in a habeas case has presented a constitutionally significant claim for ineffective

10   assistance of counsel).

**ANALYSIS**

11

**A.  Claim One**

12

13   In his first claim for relief, petitioner alleges that trial counsel James Chaffee's failure to

14   investigate and present evidence that would have corroborated the testimony of key defense witness

15   Vivian Cercy deprived him of his constitutional right to the effective assistance of counsel. He

16   asserts that if the jurors had heard all of the pertinent and readily available evidence, they would

17   have likely suspected that a third party named "Bo" committed the murders, and would not have

18   found petitioner guilty beyond a reasonable doubt. Am. Pet. at 74.

19   To prevail on a habeas claim of ineffective assistance of counsel, Petitioner must establish

20   both (1) that counsel's performance was so deficient that it fell below an "objective standard of

21   reasonableness" and (2) that the deficient performance was prejudicial, rendering the results of his

22   trial unreliable or fundamentally unfair. *See Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006)

23   (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984)).

24   A claim of negligence in conducting pretrial investigation can form the basis for a claim of

25   ineffective assistance. *See United States v. Tucker*, 716 F.2d 576 (9th Cir. 1983); *Hines v. Enomoto*,

26   658 F.2d 667, 676 (9th Cir. 1981). A defense attorney has a general duty to make reasonable

27   investigations or to make a reasonable decision that makes particular investigations unnecessary.

28   *See Strickland*, 466 U.S. at 691, *Turner*, 158 F.3d at 456. *Strickland* directs that "'a particular

1   decision not to investigate must be directly assessed for reasonableness in all the circumstances,

2   applying a heavy measure of deference to counsel's judgments.'" *Silva v. Woodford*, 279 F.3d 825,

3   836 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 491).

4         To establish prejudice, petitioner "must show that there is a reasonable probability that, but

5   for counsel's unprofessional errors, the result of the proceeding would have been different.  A

6   reasonable probability is a probability sufficient to undermine confidence in the outcome."

7   *Strickland*, 466 U.S. at 694.

8         In addressing petitioner's claim of ineffective assistance, the Supreme Court of California

9   adopted the factual findings made by the referee following the evidentiary hearing.  The court

10  rejected however, the referee's finding that trial counsel's performance was adequate.  Instead, it

11  concluded that it was deficient "for defense counsel not to make any attempt to confirm the

12  existence of "Bo" by conducting an investigation in the Grateful Dead Community.  *In re Thomas*,

13  37 Cal. 4th at 1261.  The court stated:

> As the referee found, and the parties do not dispute, Chaffee conducted no
> investigation for supporting witnesses or corroborating evidence outside Rainbow
> Village, despite knowing or having strong reason to suspect that both the victims and
> Bo came not from Rainbow Village but from the distinct Deadhead community.
>
> We conclude this omission was unreasonable.  Chaffee's apparent strategy was
> twofold: he wanted to cast doubt on the prosecutions's circumstantial evidence,
> including the apparent lack of motive, and he wanted to offer the jury the possibility
> of an alternate killer.  Given this strategy, any evidence adding to the plausibility of
> the alternate-killer theory would have been critical.  Did Bo exist?  Did he have ties
> to the victims?  What was the subject of the argument Cercy reported witnessing
> between Bo and Gioia?  Did Bo own or have access to a gun?  Given the actual
> defense strategy, these were crucial questions.  Given the knowledge that Gioia and
> Kniffin were Deadheads who had come to Berkeley for a show, and reason to suspect
> that Bo (if he existed) was likewise a member of this transient Deadhead community,
> a reasonable attorney would have made *some* effort to trace Bo in that community.
>
> Chaffee testified that he did not know how to contact anyone in the Grateful Dead
> community, nor was he aware that the band published an itinerary.  However,
> Chaffee had a description, a nickname, and the resources of the Alameda County
> Public Defender's investigations unit at his disposal.  The office's chief investigator at
> the time, Thomas Rauch, testified that he could and would have conducted a search
> with this information as a starting point.  Though the Dead and their followers had
> left town by the time Chaffee was appointed, Chaffee had the license plate of the
> "Dead On" bus that had been parked in Rainbow Village the night of the murders and
> by checking its registration could have identified its owner, Deadhead Randy Turley.
> Chaffee knew the Grateful Dead had come back to the Bay Area for one or more
> additional shows in the fall of 1985, presumably bringing with them itinerant
> Deadheads.  Despite this, he never asked an investigator to conduct any search in the
> Grateful Dead community, nor did he ask anyone more familiar with that community

United States District Court
For the Northern District of California

1
2
3

how he might go about tracking down a Deadhead. A reasonable attorney in 1985, charged with representing a capital defendant, would have pursued what leads Chaffee had in the Grateful Dead community, the community from which the victims and Bo came.

4
5
6
7
8
9
10
11
12
13

Chaffee justified limiting his search for corroborating witnesses to Rainbow Village by explaining that he was unsure Bo existed; he "was not certain he 'wanted to press to[o] hard on whether or not such a person actually existed'" and was afraid he might not find what he was looking for. The difficulty with this explanation is twofold. First, it is inconsistent with Chaffee's seeking corroboration in Rainbow Village. If the proffered justification had been Chaffee's actual tactical reason at the time, he would not have sought corroboration in Rainbow Village either. Once he did so, there was no reason not to also look in he Deadhead community. Second, whatever Chaffee's doubts, looking for Bo had no downside, a point Chaffee conceded at the evidentiary hearing. On the one hand, an investigation might have yielded corroborating evidence and demonstrated Bo's existence; on the other, even if Chaffee found nothing, an investigation could not have disproved Bo's existence. Moreover, whether Chaffee failed to investigate or investigated further and found nothing, the prosecution would still have highlighted the absence of corroboration, so not investigating did nothing to insulate the "Bo" theory from attack. Chaffee's concessions that to find Bo or corroboration of Cercy would have been helpful, and that Cercy's testimony was potentially shaky and in need of corroboration, underline the importance of investigating further. In short, the possibility of failure could not justify refusing to investigate, because such refusal guaranteed failure.

14

. . .

15
16
17

We conclude that Chaffee failed to conduct a reasonable investigation for evidence to corroborate Vivian Cercy's testimony and support the theory that someone other than Thomas was the actual killer. His decision to proceed with Cercy's testimony alone was a consequence of this unreasonably limited investigation and thus was not a justifiable tactical decision. Consequently, Thomas has demonstrated that counsel's performance was deficient.

18

*In re Thomas*, 37 Cal. 4th at 1262-65.

19

The state court continued to find however, that trial counsel's deficient representation was

20

not prejudicial. The court reasoned that of the eleven witnesses upon whose testimony petitioner

21

relied at the evidentiary hearing, only three witnesses -- Claus Von Wendel, Jong Cheol Cho, and

22

Randy Turley -- would have been discovered through a reasonable investigation. *Id*. at 1265. The

23

court concluded that in light of the considerable evidence against petitioner, the additional testimony

24

of these three witnesses would not have made a difference to the jury. *Id*. at 1271.

25

In a strongly worded dissent, Justice Kennard disagreed with the majority's view that trial

26

counsel's incompetence did not prejudice petitioner. In her view, witnesses Cho, Turley, Robert

27

Herbert, Toma Cauffield, David Kohn and Daniel Adams could have provided significant testimony

28

at trial. *Id*. at 1280-81. She noted that the majority conceded that a reasonably competent

8

investigation would have led the defense team to Cho and Turley, but disagreed with its conclusion

that the Herbert, Cauffield, Kohn and Adams would not have been located. *Id*. at 1281.  She stated

that petitioner's habeas counsel, who did not begin his investigation until eight years after the

murders, managed to find nine witnesses who were willing to testify on petitioner's behalf.  *Id*.

Justice Kennard also disagreed with the majority view that even if all of the witnesses who testified

at the evidentiary hearing had testified at trial, the outcome of the trial would not have been

different.  She stated:

> The witnesses who testified at the evidentiary hearing would have greatly
> strengthened witness Cercy's preliminary hearing testimony had they testified at
> petitioner's trial.  They would have established that "Bo" was a real person, not a
> figment of Cercy's imagination; that Bo was in Rainbow Village on the night of the
> two murders; and that Bo had an unpleasant talk with murder victim Gioia shortly
> before her death.  And had those witnesses been called at trial, their testimony would
> have shown that several months after the two murders, Bo admitted killing his
> "brother" over a woman.  The word "brother" in this context could have been a
> reference to a close companion rather than a sibling, and Bo's statement might have
> been considered by the jury as an admission of guilt.
>
> Most significant, however, was the testimony of Jong Cheol Cho.  He testified that,
> *during a conversation about the murders the day after they occurred*, Bo said he had
> gone swimming in San Francisco Bay the previous night, and that Bo then suddenly
> stopped talking after his friend Weston elbowed him in the ribs.  Unless Bo had some
> innocent reason to go swimming in San Francisco Bay at night (and the majority
> offers none) and an innocent reason to mention this late-night swim during a
> conversation about the murders (and the majority offers none), Bo's statement
> strongly implicates him in the murders of Gioia and Kniffin, whose killer or killers
> had dumped their bodies in the bay.
>
> . . .
>
> Here, if the jury had heard the testimony of the witnesses that petitioner presented at
> the evidentiary hearing, it might nonetheless have convicted him of the two murders
> and imposed the death sentence.  But there is at least a reasonable probability that it
> would not have done so.  Notwithstanding the minimal showing by the defense in
> support of its claim that Bo rather than defendant committed the murders, the jury
> deliberated for five days before rendering its verdicts.  These lengthy deliberations
> are a strong indication that the jury found the issue of defendant's guilt to be close
> and difficult.  Had defendant's trial attorney called the witnesses who later testified at
> the evidentiary hearing, his claim that James Bowen rather than petitioner committed
> the murders would have been greatly strengthened, and the jury might well have
> concluded there was a reasonable doubt about defendant's guilt and declined to
> convict him of the capital murders.

*Id*. at 1282-83.

In their current filings, the parties do not dispute that trial counsel Chaffee's representation

was deficient.  Rather, their disagreement focuses on the issue of prejudice.  Respondent argues that

**United States District Court**
For the Northern District of California

while the state court's findings that eight of petitioner's eleven witnesses could not have been located through a reasonable investigation should be confirmed by this court, he argues that proposed testimony of all eleven witnesses is too insubstantial to cast any suspicion on Bo.  Answer at 27. Petitioner however, maintains that even if the only additional witnesses had been Cho, or alternately Cho and Wendel, both of whom the state court conceded could have been found through a reasonable investigation, it is reasonably likely that the outcome of the trial would have been different.  Pet. at 71, Trav. at 45.  As discussed below, the Court finds that counsel's deficient performance resulted in prejudice.

Petitioner's counsel's performance was deficient not only by virtue of his failure to investigate the Grateful Dead community, as the state court found, but also by virtue of his inadequate exploration of other investigative leads.  As noted above, petitioner was represented at trial by James Chaffee of the Alameda County Public Defender's Office.  According to the Honorable Dean Beaupre, then Chief Assistant Public Defender, and David Andersen, supervisor of the Berkeley office, there were a number of procedures and a wealth of resources available to public defenders assigned to capital cases.  It was standard procedure at the time for an investigator to be appointed.  Rec 11(o) at 989-90.  It was also standard practice for investigators to locate and interview witnesses identified in police reports, *id*. at 939, and travel as necessary to locate and interview all potential witnesses, *id*. at 927, 993.  In this case, petitioner's counsel was specifically instructed to conduct a canvass of all persons who were in the area around the time the crime was committed.  *Id*. at 933-34. It was office policy that witnesses be interviewed by investigators rather than attorneys themselves.  *Id*. at 938.  Furthermore, an attorney handling a capital case was provided co-counsel, or second chair.  *Id.* 928.  Finally, a deputy public defender handling a capital trial would be relieved of his routine duties and other case assignments in order to allow more time to prepare for trial.  *Id*. at 930.

Chaffee, did not follow any of the above procedures or make use of the resources available to him.  He conducted the investigation himself, and did not make a single request for assistance from an investigator during the six months he spent preparing for trial.  Rec. 11(c) at 132.  As an investigator, he interviewed almost none of the potential witnesses who could have had a decisive

United States District Court
For the Northern District of California

1   impact on the outcome of trial.  He declined the opportunity to work with a second chair, until he

2   accepted the help of Susan Walsh, then still a law clerk, who was assigned to petitioner's case in

3   March 1986, the month that trial began.  Rec. 11(b) at 45-48.  Chaffee also rejected offers to be

4   relieved of his other cases and duties.  Rec. 11(o) 930.  Finally, Chaffee failed to complete even the

5   basic investigative duties that were mapped out at the beginning of the case.  For example, he did

6   not conduct a canvass of Rainbow Village, other than talk to a few permanent residents who had no

7   useful information, Rec 11(m) at 884-86, and did not try to contact anyone in the Grateful Dead

8   community.

9          The testimonies of Deputy Public Defender Andersen, investigations expert Russell Stetler,

10   Thomas Rausch, who at the time of trial was head of the public defender's investigations unit, and

11   capital defense expert Michael Burt, establish the steps a competent investigation would have

12   included:  1) use investigators and have them interview all persons mentioned in police reports,

13   2) conduct a canvass -- or essentially a census -- of everyone who was in Rainbow Village on the

14   night of the murders, 3) check information provided by defendant and backtrack his movements on

15   the night of the murders, 4) investigate the relationships between the victim and the defendant, and

16   between the victim and other potential perpetrators, and 5) investigate the physical and forensic

17   evidence.

18          As detailed below, had the aforementioned steps been followed, other witnesses who

19   ultimately testified at the evidentiary hearing, would have been located.  A review of the record

20   reveals that the Supreme Court of California's findings to the contrary are not fairly supported by the

21   record.

22          The Court will review the investigative efforts made by trial counsel, the additional

23   witnesses he could have found and the testimony they could have offered as follows:

24          **1. Daniel Adams:**  Adams, a traveling Deadhead, was present at Rainbow Village on the

25   night of the murders.  In his travels, he gained the acquaintance of a tall man with strawberry hair

26   named "Bo."  At the evidentiary hearing, he identified a photograph of James Bowen as the person

27   he knew as "Bo."  Rec. 11(e) at 207-08.  He recounted that several days before the murder, he saw

28   Bo and Gioia arguing near the communal sinks in Rainbow Village.  Rec. 11(d) at 163-64.  Gioia

seemed upset and afraid, and Bo sounded "controlling." *Id*. at 164-65.  The conversation lasted about half an hour.  *Id*. at 166.  Adams reported seeing Bo the morning after the murders.  Bo seemed nervous and agitated.  Adams overheard him say, "Sometimes a man's got to do what must be done." *Id*. at 172.  Bo packed and left the Rainbow Village in a hurried fashion.

The day after the murders, Adams was interviewed by the San Francisco Chronicle.  An article with his picture ran on the front page of the Chronicle the following day.  The article however, identified Adams as "Daniel Reynold" -- a false name Adams used because he was afraid of the police.  *Id*. at 176.  He testified however, that if a defense investigator had contacted him, he would have provided information regarding the homicides and would have testified in court.  *Id*. at 181-82.

Adams remained in Rainbow Village for about one week after the murders, and stayed in Berkeley for about five years.  During that time, he regularly attended Grateful Dead concerts.  *Id*. at 179-80.

The Supreme Court of California concluded that given Adams's use of a false name, trial counsel would not have found him.  The court did not directly address the potential value of Adams' testimony.

The Supreme Court of California's finding is not fairly supported by the record.  It ignores the uncontradicted evidence of investigation expert Russell Stetler, who testified that it is very common to start an investigation with just a nickname and a description, and that he had been successful in locating witnesses under those circumstances.  Rec. 11(k) at 682-83.  Here, Adams stayed in Rainbow Village for about one week after the murders, and stayed in Berkeley for five more years.  He attended Grateful Dead concerts during the pre-trial period.  His picture was printed in the newspaper -- albeit with a false name.  Stetler testified, without contradiction, that based on the available information, Adams would have been found through a proper investigation.  *Id*. at 693-94.

**2. Megan Barry:**  Barry was a Deadhead, living primarily in Chico, California.  During the summer of 1985, she lived for a while in the Rainbow Village.  That summer, she met Kniffin and Gioia.  She also knew "Bo."  Barry had the impression that Bo and Gioia were lovers.  She based

1  this impression on how they acted toward each other when she saw them at a party in Berkeley.

2  Rec. 11(I) at 589-90.

3       Barry left the Rainbow Village on the night of the murders to drive north. *Id*. at 561.  She

4  heard about the murders a few days later, from others who had left the Village and come up to

5  Chico. *Id*.  "Bo" was there when she first heard the news.  Several people were sitting on his car, a

6  gray or silver Scirocco or Rabbit, discussing the murder.  *Id*. 562.  Someone mentioned a newspaper

7  article that said that authorities were looking for a man in a silver Volkswagen.  Bo then told

8  everyone to get off his car and left.  *Id*. at 563.

9       In the summer of 1986, Barry met "Alabama Dave" Kohn in Chico.  In the course of a

10 discussion about the murders in Berkeley, Kohn told Barry about a man he had been camping with

11 named James Bowen, who said he had killed someone.  They realized that they were both talking

12 about the same person -- that James Bowen was "Bo."  *Id*. at 570-72.  Along with another friend,

13 they decided to call the police to reveal their suspicion that Bo was the actual killer.  They were told

14 to mind their own business.  *Id*. at 571.

15       In discussing Barry, the Supreme Court of California found that:

16       Barry left the Village before the murders.  Consequently, Barry had no personal or
         firsthand knowledge concerning the murders, nor for that matter, did she know Bo's
17       real name at the time of the murders.  Although Barry testified she met Gioia three
         months before Gioia died, the referee found this testimony of doubtful credibility,
18       contradicted by testimony from Gioia's sister indicating that Gioia left for California
         for the first time in July 1985, the month before she died.  Thus even if Barry's name
19       had come up in interviews of fellow Deadheads, nothing would have revealed that
         she had relevant information about the murders, Bo, Gioia, or Kniffin or that she
20       should be sought out any more than dozens of other Deadheads.

21 *In re Thomas*, 37 Cal. 4th at 1267.

22       The Supreme Court of California's finding is not supported by the record.  The state court

23 ignored the testimony of investigations expert Russell Stetler, who testified that given the techniques

24 that were available at the time of the murders, he could have learned, prior to the trial, of the

25 existence, whereabouts and potential usefulness of Barry.  Rec. 11(k) at 691-93.  Had Barry been

26 located, she could have confirmed that there existed a "Bo" at Rainbow Village who fit Vivian

27 Cercy's description (a fact not otherwise supported by any other testimony at petitioner's trial), that

28 Bo and Gioia had appeared to be intimate with each other, and that he left a conversation connecting

him and his car to the killings.  Additionally, through her contacts in the Deadhead community, she could have led the defense team to a number of other witnesses with information about the case -- as she did a decade later when contacted by the habeas investigator.

**3. Jong Cheol Cho:**  Cho was a traveling Deadhead.  Chaffee knew of Cho, as his name and address were disclosed in a police report.  The Supreme Court of California found that a competent investigation would have located Cho.  *In re Thomas*, 37 Cal. 4th at 1271.

Cho testified that he knew someone named Bo and identified pictures of James Bowen as the man he knew to be Bo.  Cho was in Rainbow Village on the night of the murders.  He testified that the morning after the murders, he had a conversation with Bo and another man named Weston Sudduth about the previous night.  Bo said that "I" or "we" "went swimming in the Bay last night." Rec. 11(e) at 269-70.  In response, Weston jabbed him in the ribs and gave him a look.  The conversation ended.  Cho spoke briefly to the police that day but did not mention this conversation.

**4. Claus Von Wendel:**  Von Wendel lived on a boat near Rainbow Village.  At the evidentiary hearing, he testified that on the morning of August 16, 1985, he awoke to find that someone had left a bag on his boat.  Inside the bag, he found an out-of-state driver's license for a dark-haired male, shoes, books and blanket-type material.  Rec. 11(g) at 427.  Later that day, a blond-haired man driving a Volkswagen came to claim the bag.  *Id*. at 429.  Von Wendel was upset that the blond man had left the bag on his boat.  The blond man informed him that he had also spent the night on the boat.

Still later that day, two deadheads named Burney Royster and Marie Marino, visited Von Wendel.  He described the blond man to them and they recognized him as "Bo."  Von Wendel did not know Bo.  At the evidentiary hearing, he identified photographs of James Bowen as the man who appeared on the boat.  *Id*. at 431, 435.

A defense investigator spoke with Von Wendel on June 11, 1986, *after* petitioner had been convicted in the guilt phase of trial.  At that time, the investigator learned of the incident with Bo. In the same interview, Von Wendel told the investigator of an incident in which petitioner had threatened a woman with a dog.  When Von Wendel intervened, petitioner left and returned with a machete.

**United States District Court**
For the Northern District of California

In discussing Von Wendel, the California Supreme Court concluded that although he was interviewed by the defense investigator, trial counsel "made a tactical decision not to call von Wendel, reasoning that calling him would allow the prosecution to introduce [the machete] incident. Thomas does not challenge this tactical justification. Thus, the failure to call von Wendel was not a prejudicial consequence of the defense's limited investigation." *In re Thomas*, 37 Cal. 4th at 1270-71.

Petitioner challenges trial counsel's tactical justification in his amended petition. He argues that the "machete incident" would not have been admissible at the guilt phase of trial unless petitioner first attempted to prove his character for non-violence, which he assuredly would not have done. *See* Cal. Evid. Code §§ 1101(a) & 1102(b). Respondent does not contest this assertion.

Petitioner is correct. As he points out, there was no good reason for counsel not to have interviewed Von Wendel, and no good reason not to use the evidence he could have provided to corroborate Vivian Cercy's account.

**5. Randy Turley:** Randy Turley was a traveling Deadhead. Trial counsel knew of Turley, as his name and address were disclosed in a police report. The Supreme Court of California concluded that a reasonable investigation would have located Turley. *In re Thomas*, 37 Cal. 4th at 1271. Turley would have been a useful witness in that he could have helped locate other witnesses.

Turley was the registered owner of the "DeadOn" bus (with a DeadOn license plate), which he used to transport Deadheads from show to show. Rec. 11(h) at 490-91. Although he lived on the DeadOn bus and rarely missed a performance, he happened to be out-of-state when the murders occurred. *Id*. at 493. Nonetheless, Turley could have easily led the defense team to witnesses such as Cho, Barry, James "Burney" Royster and Marie Marino. *Id*. at 496, 500-505. Turley also knew Bo, whom he described as a tall, thin man with strawberry blond hair, and whom he identified when shown pictures of James Bowen. *Id*. at 497-98, 521.

Turley testified that if someone from petitioner's defense team had requested his assistance in locating witnesses, he would have been happy to help. *Id*. at 501-02. He also testified that public information about upcoming Grateful Dead concerts was very easy to find. There was even a "hotline" number that one could call. *Id*. at 529.

**6. James Berney Royster:** Royster was a Deadhead and Rainbow Village resident. At the time of the murders, he was living with his girlfriend, Marie Marino, on a converted school bus in the Village. His testimony was presented at the evidentiary hearing in state court in the form of a deposition taken by the parties in 1997.

On the morning of August 16, 1985, Royster had coffee with petitioner before going to work. Petitioner seemed distressed and asked Royster if he had seen anyone "messing" with his vehicle during the night. Petitioner explained that someone had stolen a gun from his car. Docket No. 247 (depo. transcript) at 11.

When Royster and Marino returned from work that day, they visited Von Wendel, who told them about the discovery of Gioia's body. *Id*. at 19-21. He also told them about the bag that was left on his boat the previous night and the blond man who came to claim it. Based on Von Wendel's description, Royster and Marino immediately identified the blond man as "Bo" -- whom they knew as someone who sold tie-dyed shirts at Grateful Dead shows. *Id*. at 24. Royster had seen Bo at Rainbow Village the day before. *Id*. at 25. Bo and Weston Sudduth were traveling together. *Id*. at 26.

After learning the shocking news about Gioia, Royster spoke to several people at Rainbow Village, including Vivian Cercy. Cercy seemed scared and gave him an account of what she had witnessed the night before: a woman and two men were arguing, they split up and subsequently she heard three "bangs." Later she saw a blond man walking up the road, wiping his hands. Still later, she saw the blond man washing himself at the community sinks. *Id*. at 52-55.

After the murders, Royster continued to live at Rainbow Village intermittently, and continued to attend Grateful Dead concerts. Although Bo had been a constant presence at the concerts before the murders, afterwards his attendance dwindled off. *Id*. at 28.

In June 1986, Royster and Marino were vacationing in rural northern California when they heard the news that petitioner had been convicted of the Rainbow Village murders. They felt strongly that petitioner was innocent and drove back to Oakland to try to help the defense. On June 11, 1986, the first day of the penalty phase of petitioner's trial, Royster and Marino were interviewed by the defense investigator Thomas Rauch. A transcription of the interview was forwarded to trial

16

**United States District Court**
For the Northern District of California

1   counsel Chaffee, but neither Chaffee nor anyone else from the defense team ever spoke to them until

2   a habeas investigator contacted them in the mid-1990's.

3          In discussing Royster, the Supreme Court of California dismissed his testimony, noting that

4   his "personal knowledge was limited to confirming that a man he knew as Bo was in Rainbow

5   Village at the time of the murders, and relating his perception that Bo's appearances at Dead shows

6   dwindled between the murders and Thomas' conviction." *In re Thomas*, 37 Cal. 4th at 1267.  The

7   court acknowledged that Royster was knowledgeable about the Deadhead community and could

8   have provided trial counsel with a list of names of members, but noted that there would be no

9   indication as to who on the list might actually have information about the murders.  The court

10  remarked that the "numerous steps needed to locate Royster demonstrate the cost of such a further

11  investigation." *Id*.  The court finally concluded that Royster would not have been located through a

12  reasonable investigation, noting that the habeas investigator had to make a series of four contacts to

13  find him.  In any event, the referee had found Royster to lack credibility.  *Id*. at 1268.

14         The Supreme Court of California's findings are not supported by the record.  Royster could

15  have been located through Turley alone.  Turley saw Royster all the time, either at the Rainbow

16  Village, or at Grateful Dead concerts.  More importantly, uncontradicted testimony established that a

17  canvass would have been the obvious investigative starting point for petitioner's case, and would

18  have led to Royster.  Indeed, trial counsel's supervisor had explicitly directed that such a canvass

19  take place, but trial counsel never performed one.

20         Furthermore, the Supreme Court of California's apparent deference to the referee's finding

21  that Royster lacked credibility is unwarranted since his testimony came in by way of the transcript of

22  his deposition.  The referee thus was in no position to judge Royster's credibility.

23         Royster could have been helpful to the defense not only by virtue of his connections within

24  the Deadhead community, but more importantly, by providing evidence of Cercy's prior consistent

25  statement  regarding the events she witnessed on the night of the murders.  Given that the

26  prosecution's response to Cercy's testimony was that she made up the story for the police, Royster's

27  testimony would have been especially helpful.  Royster could also have confirmed, as the state court

28  noted, that a man he knew as Bo was in the Village at the time of the murders, and that his

attendance at Grateful Dead concerts dwindled in their aftermath.  Such corroboration would have been helpful to the defense.

**7.  Lee ("LeBo" or "Stagger Lee") Andersen:**  In 1985, Andersen was a Deadhead and former Rainbow Village resident.  He had been kicked out of the Village for excessive drinking and noise.  He was also known as "LeBo" or "Stagger Lee."  Rec. 11(I) at 542.  At the time of the evidentiary hearing in 2002, Andersen had a dry wall contracting business in Cape Cod, Massachusetts, and had been sober for more than thirteen years.  *Id*. at 534-35.

At the evidentiary hearing, Andersen testified that on the night of the murders, he was sleeping outdoors just outside Rainbow Village, close to where Vivian Cercy had parked her car.  He had not had enough to drink that day and was having trouble sleeping.  *Id*. at 537.  At some point in the early hours of the morning, he saw a man in a pea coat approach Cercy's car, bend over and say something to her.  The man walked away, returned and spoke to her another time.  *Id*. at 537-38.  Andersen did not overhear the conversation but it appeared to him that they were arguing.  *Id*. at 554.  Andersen did not hear any gunshots that night, maybe because he had fallen asleep.  *Id*. at 551-52.

Trial counsel Chaffee was aware of Andersen's existence and at one point, set up a meeting with him through Lenise Christy Allen, petitioner's girlfriend, at People's Park in Berkeley.  Andersen did not show up and counsel made no further effort to locate him.

The Supreme Court of California concluded that because Andersen failed to show up to the meeting, "the failure to locate Andersen did not result from Chaffee's failing to explore a lead and was not a consequence of ineffective assistance."  *In re Thomas*, 37 Cal. 4th at 1269.  The court further noted that the referee found Andersen's testimony to lack credibility, and that his testimony did more to impeach rather than corroborate Cercy because he did not hear any gunshots.  *Id*.

The state court's finding that a competent investigation would not have located Andersen is not supported by the record.  Investigative expert Stetler testified without contradiction that it is commonplace for a witness to miss an appointment.  It would not stop a competent investigator from trying to find that witness.  By staking out locations Andersen was known to frequent, a competent investigator would have found him.  Rec.11(k) at 694-95.  The Court defers however, to the state

United States District Court
For the Northern District of California

1  court's finding that Andersen lacked credibility.

2    **8. Robert Herbert and Toma Cauffield:**  Toma Cauffield and her boyfriend, Robert

3  Herbert, moved to California in the summer of 1985 and settled in the Deadhead community living

4  in Chico.  Rec. 11(l) at 732, Rec. 11(o) at 960.  In August 1985, they rented an apartment there with

5  several friends.  Rec. 11(o) at 960-61.  In late August or early September 1985, they took in as a

6  roommate a thin, strawberry-blond man they knew as "Bo."  From mail that came to the house,

7  Herbert learned that Bo's real name was "James Bowen."  Rec. 11(l) at 736-39.  Bo drove a silver or

8  yellow Volkswagen Scirocco or Dasher.  *Id*. at 740.

9    Several weeks after Bo moved in, Herbert and Cauffield witnessed a confrontation in their

10  living room between Bo and Weston Sudduth.  *Id*. at 743.  Herbert testified that Sudduth angrily

11  demanded: "How can you sleep at night?  How can you live with yourself?  Why were you washing

12  your hands in the early morning in the bathroom?"  *Id*. at 745.  In response, Bo was passive and

13  sheepish.  *Id*. at 746.

14    The incident made a strong impression on Herbert and Cauffield.  Herbert found it disturbing

15  and unsettling.  *Id*. at 747.  At the time, neither Herbert nor Cauffield knew about the Rainbow

16  Village murders, but Cauffield immediately inferred that Bo had "done something extremely wrong,

17  extremely bad, and that it was . . . big time.  Whatever he did was a big deal, and it had to have been

18  incredibly awful."  Rec. 11(o) at 985.

19    After that incident, Bo's behavior became increasingly strange and reclusive, until he finally

20  disappeared one night, leaving no note or explanation.  Rec. 11(l) at 751, Rec. 11(o) at 972-73.

21  Although Bo had been a regular at Grateful Dead concerts, Rec. 11(o) at 963-64, he virtually

22  stopped attending them thereafter.  Rec. 11(l) at 751-52.

23    The Supreme Court of California disregarded Herbert's and Cauffield's testimony on the

24  ground that they would not have been encountered in the course of a competent investigation.  *In re*

25  *Thomas*, 37 Cal. 4th at 1269.  The state court stated that "Thomas's assertion that they could have

26  been located depends on trial counsel's making the Bo-Bowen connection.  Moreover, unless

27  counsel made that connection immediately after the murders when Bowen was living with Herbert

28  and Cauffield, Herbert and Cauffield could not have been located without an investigator's working

backward to identify and visit every place the (apparently transient) Bowen had stayed since the murders." *Id*.

The state court's conclusion is not supported by the record. The court's assertion that locating Herbert and Cauffield would have required trial counsel to make the "Bo-Bowen connection" is perplexing, since Herbert and Cauffield could have made that connection *for* trial counsel. They knew that Bo and James Bowen were the same person. Furthermore, the state court acknowledges that trial counsel might have located Herbert and Cauffield in the course of a routine canvass of the Chico Deadhead community, but asserts that the defense team did not have any reason to search for witnesses in Chico. *In re Thomas*, 37 Cal. 4th at 1269 n.9. This conclusion ignores the fact that investigative leads would have pointed to Chico had a routine canvass of Rainbow Village been performed: a number of Deadheads, including Megan Barry, went to Chico from there, and a conversation with any number of them would have suggested that Chico was fertile ground for finding Deadheads. Additionally, the address of the registered owner of the DeadOn bus -- Randy Turley -- was in Chico.

**9. Mel Vapour:** Vapour was a local filmmaker associated with the East Bay Media Center in Berkeley. Rec. 11(l) at 790. In August 1985, he was working on a documentary about people who lived in their vehicles at Rainbow Village. *Id*. at 791. In the course of producing the documentary, he became acquainted with Harry Shorman, who was the unofficial "mayor" of Rainbow Village. *Id*. at 791-92.

After the murders occurred, Shorman invited Vapour to Rainbow Village to interview people about what happened. *Id*. at 792. One of the people Vapour interviewed was Vivian Cercy, who insisted that they not show her face because she was fearful for her life. *Id*. at 792, 795. The account Cercy gave Vapour was consistent with the account she later gave in court. Vapour's videotape and testimony, which were introduced at the evidentiary hearing in state court, were important in that they comprised a prior consistent statement that would have rebutted the prosecution's claim that Cercy had fabricated her story.

The Supreme Court of California discounted the importance of Vapour's testimony and videotape with the finding that "substantial evidence supports the conclusion that Vapour could not

United States District Court
For the Northern District of California

have been located." *In re Thomas*, 37 Cal. 4th at 1270 n.10.  The record however, does not contain evidence to support this conclusion.  To the contrary, as petitioner points out, trial counsel could have come across Vapour merely by asking Shorman, with whom he had frequent contact, whether he or Cercy had any contact with the media.  The state court's finding is not supported by the record.

**10. David "Alabama Dave" Kohn:** At the time of petitioner's trial, Kohn was a teenage Deadhead known as "Alabama Dave."  Rec. 11(f) at 360.  He came to California in February 1986 to attend a Grateful Dead concert.  Soon after his arrival, he moved into a communal house in Chico with James Bowen and others.  *Id*. at 363.  At one point, Bowen told Kohn that women are evil, and that he once "killed his brother over a woman."  *Id*. at 370.  At that time, Kohn was not aware, as Cho explained, that Deadheads commonly referred to each other as "brothers" and "sisters."  Rec. 11(e) at 302.

At the end of May 1986, Kohn and Bowen parted ways.  Rec. (f) at 375-76.  In June 1986, Kohn met Megan Barry in Chico.  *Id*. at 376.  In the course of a conversation about the murders with Barry, Kohn realized that the suspect she was describing as "Bo" was James Bowen, and the significance of Bowen's statement about killing his brother became apparent to him.  *Id*. at 380-81.  Kohn and Barry called the police to alert them of their suspicions regarding Bowen.  Rec. 11(g) at 422.

In discussing Kohn, the Supreme Court of California concluded that Kohn would not have been located in the course of a competent investigation.  *In re Thomas*, 37 Cal. 4th at 1268.  The state court characterized petitioner's argument to the contrary as relying on defense counsel making the "Bo-Bowen" connection, when in fact none of the witnesses traceable through a reasonable investigation knew that Bo was James Bowen.  *Id*.

The state court's conclusion ignores the uncontradicted testimony of investigations expert Russell expert, who opined that Kohn "could definitely have been found" in the spring of 1986 through the use of routine and basic investigation techniques.  Rec. 11(k) at 693-94.  Indeed, as petitioner points out, several of the witnesses known to trial counsel knew Bo, knew that he was a Deadhead, and that Chico was a center for Deadheads.  Randy Turley, for example, knew all of these things and would have put counsel in touch with Megan Barry, who in turn would have alerted

**United States District Court**
For the Northern District of California

1   counsel when she met Kohn.  The state court's finding that Kohn could not have been located is not

2   supported by the record.

3       **11.  Vincent Johnson:**  Petitioner submits the declaration of a key prosecution witness,

4   Vincent Johnson, in which Johnson recants statements made at trial suggesting that Cercy told him

5   that she had not seen anything on the night of the murders. Decl. of Vincent Johnson at 8, Exh. 7 of

6   Am. Pet. filed July 2, 1997.  He also asserts that at the time of trial, he was being prosecuted in a

7   separate case by the same district attorney's office, and that he was promised that in exchange for his

8   testimony, charges against him would be dropped.  *Id*. at 7.  Petitioner states that his trial counsel did

9   not adequately investigate or cross-examine Johnson.  To the extent that petitioner's allegations

10  regarding Johnson are reiterated in claim 4, the Court will reserve its consideration of them until that

11  claim is reviewed.

12      As noted *supra*, of the above witnesses, the Supreme Court of California found that a

13  reasonable investigation would have led trial counsel only to Cho, Von Wendel and Turley, but

14  found no reasonable probability that the outcome of the trial would have been different as a result.

15  *Thomas*, 37 Cal. 4th at 1270-71, 1277.  The court reasoned that Von Wendel would not have been

16  called as a witness due to his argument with petitioner, and therefore the only additional evidence

17  would have been Cho and Turley's testimony that there was indeed a man named Bo, and Cho's

18  additional testimony about Bo saying he had been "swimming in the Bay last night."  *Id*. at 1270-72.

19  The court found that on the other hand, "though circumstantial, the evidence against Thomas was

20  considerable."  *Id.* at 1277.  The court then concluded that not only would Cho and Turley's evidence

21  have failed to sway the jurors, but the verdict would have been the same even if *all* of the above

22  witnesses had testified.  *Id*. at 1276.  This is because the prosecution's case was so strong that "even

23  if listening to the habeas corpus witnesses might in the abstract make one ponder a small possibility

24  that 'Bo' *might have* killed Gioia and Kniffin, listening to the prosecution case  would have

25  established in a reasonable juror's mind the near certainty that Thomas *did* kill them."  *Id*. at 1277.

26      An exhaustive review of the record and applicable law leads this Court to reach a contrary

27  conclusion.  While after hearing all the evidence, the jurors may have still believed that petitioner

28  was the murderer, they would however have been likely to suspect that Bo committed the murders

**United States District Court**
For the Northern District of California

1    and would not have found petitioner guilty beyond a reasonable doubt.

2           At the outset, the evidence against petitioner was entirely circumstantial and not substantial.

3    As noted *supra*, it included 1) petitioner's ownership of a rifle that could have inflicted the victims'

4    wounds, 2) sightings of Thomas alone with the victims shortly before the killings, 3) petitioner's

5    conduct and statements before and after the murders, and 4) a corncob pipe recovered at the murder

6    scene that was argued to belong to petitioner. *Id.* at 1253. There were no eyewitnesses to the crime,

7    no confession, no murder weapon was found, and there was no blood or DNA tying petitioner to the

8    crime. Courts have found cases where no physical evidence links the accused to the crime to be

9    close ones. *See*, *e.g.*, *Rios v.* Rochas, 299 F.3d 796, 810 (9th Cir. 2002) (state's case at best was a

10   close one where there was no weapon found, no fingerprints, no gunpowder residue, no DNA

11   evidence); *Alcala v. Woodford*, 334 F.3d 862, 872 (9th Cir. 2003); *Mitchell v. Ayers*, 309 F. Supp.

12   2d 1146, 1155 (N.D. Cal. 2004).

13          Moreover, each item of evidence lends itself to an explanation that is not inculpatory.

14   Petitioner's rifle, which was never clearly established as the murder weapon, could well have been

15   stolen, just as he consistently told people. The fact that petitioner was seen with the victims the

16   night of the murders does not establish that he killed them, particularly given that Bo was reportedly

17   seen with the victims later under more suspicious circumstances. That petitioner's corncob pipe was

18   found near the crime scene can be explained by the fact that petitioner and the victims had been

19   smoking marijuana from that pipe, *see Thomas*, 37 Cal. 4th at 1273, and the plausible possibility that

20   he did not retrieve it from them. Petitioner's statement, "That's Mary," identifying Gioia's body

21   when he was 45 feet away loses its significance when considered in light of the fact that he had

22   already seen the body from a closer distance before he made the remark to the police officer, *see* am.

23   pet. filed June 2, 1997, Exh. 9 (Shorman's declaration) at 7, as well as Gioia's distinctive and

24   eccentric manner of dress, which would have been recognizable to petitioner given that he had spent

25   the previous evening in her company. Finally, petitioner's "inconsistent statements," which mostly

26   pertained to his wanderings the night of the murder, are not so numerous, inexplicable or

27   dramatically inconsistent as to suggest a fabricated story. For example, one of the inconsistencies

28   cited by the state court was that petitioner initially stated that Kniffin had not been partying with

petitioner and others the night before the murders, but later said that he was in fact with them. *Thomas*, 37 Cal. 4th at 1274.  As the trial evidence established, Kniffin was not part of the party when it started, but was picked up by the group later, after they gave another partygoer a ride to Richmond.  Furthermore, although petitioner's story about trekking around Berkeley on the night of the murders may have been strange, he was perhaps a strange person, but not necessarily a murderer. Petitioner told Detective Eihl that on the night before the murders, he partied with Gioia and others in a van.  *Id.* at 1273.  He stated that he later ran into Gioia and Kniffin on a road leading from Rainbow Village to a liquor store, smoked marijuana with them, proceeded to go to the liquor store, found it closed, came back to Rainbow Village, got money and went to various locations to try and buy marijuana.  When it grew light, he went to a laundromat to do laundry and then returned to Rainbow Village.  *Id.*  While these activities may be odd, they are not necessarily suggestive of guilt.

Although the sum of circumstantial evidence presented against petitioner was perhaps sufficient to justify his conviction, it does not follow that his trial would have yielded the same result had a competent investigation been completed.  Indeed, had Cho, Von Wendel and Turley, all three of whom the state court conceded would have been found through a competent investigation, testified at trial, there is a reasonable probability that the outcome of trial would have been different.

Cho would have testified that there actually was a man named "Bo" in the Deadhead community who matched Vivian Cercy's description, and that he was in Rainbow Village on the night of the murders.  Turley would have corroborated Bo's existence and description.  This would have established that Cercy was not fabricating her story.  More importantly, Cho would have informed the jury that the morning after the murders,  he had a conversation with Bo and Bo's friend Weston Sudduth, during which Bo said that "I" or "we" went swimming in the Bay last night," prompting Sudduth to jab him and give him a look and thus ending the conversation.  At this point, the jury would have had a plausible alternate scenario about the murders that did not inculpate petitioner.  Testimony such as this, that corroborates an otherwise bare defense, "would have created more equilibrium in the evidence presented to the jury."  *Riley v. Payne*, 352 F.3d 1313, 1320-21

United States District Court
For the Northern District of California

(9th Cir. 2003).

The jury would have also heard from Von Wendel.  Von Wendel would have testified about his confrontation with Bo, who had suspiciously left a bag on Von Wendel's boat some time during the night of the murders -- a bag whose contents corresponded to the shoes and poncho that were missing from  Kniffin's body when it was found.  RT 3129-30; Rec. 11(g) at 427.  When combined with Cho's testimony about Bo swimming in the Bay, Von Wendel's testimony would have bolstered Cercy's account, and would have led the jury to harbor a reasonable doubt as to whether Bo, rather than petitioner, committed the murders.

Had counsel conducted a reasonable investigation however, the jury would have also heard from other witnesses.  There is ample support in the record for the conclusion that "by using investigative techniques that were routinely employed in the mid-1980's . . . trial could easily have learned of the existence and whereabouts of each person."  Supp. Decl. of Michael Burt at 317-21 (Rec. 12 (b)); *accord* Rec. 11(k) at 691-95 (Russell Stetler).  A demonstration of the fact that the above witnesses could have been found using basic investigative techniques is that they *were* found through the use of such techniques by legal assistant James Barnes following a cold trail nearly a decade later.  According to petitioner, Barnes started by running the license plate "DeadOn" and located Turley.  When asked about Bo, Turley confirmed that he existed and put Barnes in touch with a former girlfriend of Bo's who provided his real name -- James Bowen -- and the photograph used to identify him.  Turley also put Barnes in touch with Megan Barry.  Barry in turn, gave Barnes the  names of Daniel Adams, David Kohn, Burney Royster and Marie Marino, as well as information needed to locate them.  Lee Andersen, Cho and Von Wendel were all mentioned by name in police reports.  They were found using standard search techniques involving DMV records and the like.  Each of the above witnesses was found using technology available in 1985-86.

The state court suggests that it took from 1987, when state habeas counsel was appointed, until 1997, when the exhaustion petition was filed to locate Adams and Kohn, and that it took another five years to find Turley, Cho, Cauffield and Herbert.  The court notes that by contrast, trial counsel had only six months to prepare for trial.  *Thomas*, 37 Cal. 4th at 1266 & n.7.  Petitioner however, correctly points out that while jury selection began in March 1986, the defense did not put

United States District Court
For the Northern District of California

1    on its case until May of that year - giving trial counsel nine months to conduct an investigation.

2    Furthermore, he explains that Mr. Barnes' efforts did not begin until 1993, when his case was filed in

3    federal court.  At that point, he fairly quickly tracked down all relevant witnesses.  Furthermore, he

4    correctly notes that the witnesses would have been easier to locate in 1986 than they were in the

5    1990's, after they had all gone their separate ways.

6         In sum, had a competent investigation been conducted, the jury would have also heard from

7    Daniel Adams, who would have testified about an argument between Gioia and Bo several days

8    before the murders.  He would have further told the jury that on the day that Gioia's body was found,

9    Bo said: "Sometimes a man's got to do what must be done" - and then left the Rainbow Village.

10        The jury would have heard from Megan Barry, who would have confirmed that she had seen

11   Bo and Gioia together at a party in Berkeley, at which time they appeared to have an intimate

12   relationship.  She would have testified that she saw Bo shortly after the murders, when a discussion

13   about a newspaper article that linked a car like his and a man like him to the crimes caused him to

14   flee abruptly.

15        The jury would have heard from David Kohn, who would have testified that Bo had

16   confessed to having killed "his brother" over a woman.

17        The jury would have heard from Toma Cauffield and Bert Herbert about the confrontation

18   between Bo and Weston Sudduth in their living room several weeks after the murders, during which

19   Sudduth demanded: "How can you sleep at night?  How can you live with yourself?  Why were you

20   washing your hands in the early morning in the bathroom?" They would have also learned of Bo's

21   personality change after that confrontation took place.

22        The jury would have heard from Burney Roaster, who would have confirmed that Bo was in

23   Rainbow Village at the time of the murders, and would have confirmed that within a day of the

24   murders, Cercy gave him the same account of what she witnessed on the night of the murders as she

25   gave on the witness stand.  This would have discredited the prosecutor's claim that Cercy's account

26   was fabricated.

27        Finally, the jurors would have heard from Mel Vapour, who would have testified that  he had

28   taped an interview with Cercy, in which she gave the same account of the night of the murders as

26

**United States District Court**
For the Northern District of California

1   she later gave on the witness stand.  This would have provided another prior consistent statement

2   that would have vitiated the prosecutor's attempt to discredit her.

3           Respondent contends that much of the testimony petitioner now sets forth could not have

4   made a difference because it was hearsay and inadmissible.  Answer at 50.  The Court however, is

5   not precluded from considering the evidence proffered by petitioner.  As the United States Supreme

6   Court has made clear, the Court need not make state-law evidentiary findings, and must evaluate the

7   totality of the evidence adduced at trial and in habeas proceedings.  *See Wiggins v. Smith*, 539 U.S.

8   510, 536 (2003); *Pinholster v. Ayers*, 525 F.3d 742, 766 (9th Cir. 2008).  Petitioner's proffered

9   evidence is properly before the Court.

10          Even absent the testimony of witnesses proffered by petitioner in his habeas proceedings,

11  petitioner's case was a close one as evidenced by the length of the jury's deliberations.  It took the

12  jury five days to reach its guilt verdict.  This suggests that members of the jury had doubt as to the

13  correct result.  *See Belmontes v. Ayers*, 529 F.3d 834, 872 (9th Cir. 2008) (jury members had doubt

14  during deliberations where they took substantial amount to reach result); *Jennings v. Woodford*, 290

15  F.3d 1006, 1019 (8th Cir. 2002) (two days of jury deliberations suggested prejudice under *Strickland*

16  analysis); *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (four days of

17  deliberations indicated likelihood of prejudice).

18          Another indication of the jury's difficulty in reaching a result was their requests for

19  readbacks of trial testimony.  *See, e.g. Belmontes*, 529 F.3d 872, *Osborne v. United States*, 351 F.2d

20  111, 118 (8th Cir. 1965).  The jury requested three readbacks: the first was for Cercy's "testimony"

21  to the police, and the last was for the "testimony regarding the Grateful Dead fans or grouppies

22  [*sic*]."  Reporter's Transcript 3580, 3583, 3594.  The record thus establishes that the jurors did not

23  simply reject petitioner's defense out of hand.  The jury's requests for readbacks, combined with the

24  length of deliberation, call into question the state court's characterization of the circumstantial

25  evidence against petitioner as overwhelming.

26          The Court concludes that had trial counsel conducted a competent investigation, confirmed

27  Bo's existence and presented corroborating evidence of Cercy's testimony, there is a reasonable

28  probability that as least some jurors would have harbored reasonable doubt with respect to

1  petitioner's guilt.  His failure to do so undermines confidence in the outcome of his trial.

2       For the reasons stated above, the Court finds that counsel's assistance at the guilt phase was

3  deficient and prejudicial.  Claim One is therefore granted in favor of petitioner.  The remaining

4  claims in the Amended Petition are denied without prejudice as moot.

5       Petitioner's conviction is vacated.  The Court orders that this case be remanded to the

6  Superior Court for the County of Alameda for a new guilt phase trial.

7       **IT IS SO ORDERED.**

8  **DATED:**  September 9, 2009

9

10  _____
    **MARILYN HALL PATEL**
    **United States District Judge**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

28